## McLANE v. SPENCE, Adm'r.

1. One who is administrator of two estates, may elect to which of the two certain property belongs. But the act manifesting such election, must be definite, clear, and certain, and not ambiguous or doubtful, to estop him from afterwards asserting title.
2. A decree in chancery, though in form final, which is in its nature interlocutory merely, cannot be pleaded in bar of another action.

Error to the Circuit Court of Talladega.

Trespass *vi et armis* by the defendant, against the plaintiff in error, for forcibly taking six slaves out of his possession; viz., Mike, Candice, Leah, Adeline, Harriet and Margaret.

The declaration charges, the forcible taking of the slaves

from the possession of one Miller, to whom they had been hired as the property of the estate of John C. Calhoun, of which the plaintiff was administrator.

The defendant pleaded—1. Not guilty.   2. That as coroner of Talladega county, he seized and sold the slaves, by virtue of two writs of *fieri facias*, which issued on judgments obtained against the plaintiff as administrator of one William King, deceased, and alledges, that the slaves were the property of the plaintiff, as the administrator of W. King.   3. He craved oyer of the letters of administration of the plaintiff, which being read, he says *actio non*, because he says the plaintiff is not, and never hath been administrator of the said John C. Calhoun, deceased, in manner and form as he hath alledged, and this he is ready to verify, &c.   4. At the trial term, the defendant pleaded *puis darrein continuance*, the record and decree, made in a suit in chancery instituted in the chancery court of Talladega by David A. Calhoun, against the defendant and others, to recover these slaves, as the heir of his father, David Calhoun, and as the heir of his brother, John C. Calhoun, and that by the decree of the court, an account was ordered, and a decree rendered in favor of the complainants, against the purchasers of these slaves, at the sale made by the defendant as coroner, for such portion thereof as might be ascertained by the master's account, and for which an execution was ordered to issue when so ascertained.   This is a brief abstract of the plea, which sets out at length, all the proceedings, and the decree made in the said suit in chancery, entitled David A. Calhoun v. McCartney and others.   See this case reported at length, *supra.*

To this plea the plaintiff demurred, and his demurrer was sustained by the court.

A bill of exceptions taken at the trial of the cause discloses, that William King died, having made his will, and appointed his wife Matilda, and John C. Calhoun, executrix and executor, of his last will.   That the will was proved and recorded in the orphans' court of Talladega.   That the executors gave bond with good security, and took upon themselves the execution of the will.   That they returned an inventory of the goods and chattels of King's estate, embracing the slaves in

the declaration mentioned. That in December, 1840, a sale of the personal property of the estate was made by the executors, pursuant to notice duly given. That the sale was numerously attended by persons able to purchase, the plaintiff among the number. That J. C. Calhoun directed twelve of the slaves to be put up in one lot, (including those here in controversy,) and purchased them himself at the price of $5,050.

That on the .... day of ...., Calhoun died, and the executrix was removed, at the instance of the sureties. That on the same day, one Griffin, sheriff, was appointed administrator *de bonis non* of King, and also administrator of Calhoun. That the plaintiff, as the successor of Griffin in the sheriffalty, succeeded to his administration on that estate on the 17th March, 1842. That whilst Griffin had control of the slaves, he advertised them for hire as the property of Calhoun's estate, but being sick, employed an agent to attend to the hiring, who by mistake took the notes for the hire of the slaves, payable to Griffin as the administrator of King, instead of Calhoun. The slaves were in the possession of the persons hiring them, when they were levied on by the defendant in September, 1842, and sold by him as coroner.

The defendant proved that at the sale made by Calhoun, of King's estate, he was desired by one wishing to purchase, to put the slaves up separately for sale, and offered to bid $800 for one Isaac, but Calhoun refused, alledging that he wished to keep the family together, and wished to buy them himself, and in the opinion of the witness the slaves, or some of them, would have sold better if they had been sold separately. The defendant also produced the executions upon which he made the levy and sale, which issued upon judgments rendered in favor of one McCartney, against the plaintiff as the administrator of King. That the plaintiff being sheriff, the executions issued to him as coroner, which he levied on the slaves in September, 1842, and sold them in October or November, 1842, and credited the proceeds of the sale on the executions, and that the slaves sold for a fair price.

He further proved that when Calhoun executed his bond as executor, he lacked two months of being twenty-one years old. He proved by the clerk of the orphans' court, that in

January, 1841, Calhoun brought to the office what he called
a sale bill of the estate of King, which he refused to receive
because it was illegible, and badly made out, and he never
returned any other, but died soon afterwards.    That the ac-
count of the sale of King's estate, in which the slaves are re-
turned as having been purchased by J. C. Calhoun, was re-
turned to the office by the executrix, after her removal from
office as executrix.

He also offered in evidence, the transcripts of the records
of the orphans' court of Talladega, in the matter of the ad-
ministration of the estates of King and J. C. Calhoun.

In the report of Spence to the judge of the orphans' court,
praying that the estate of King may be declared insolvent,
among the debts due by the estate enumerated by him, is the
following item:

" To balance judgment in favor of C. K. Mc-
Cartney, ...........................       $229 33
To amount of notes received for hire of negroes,
which had been sold before the time expired
for which they were hired...............       442 48
He also puts down as an item of debt:
To amount against estate of J. C. Calhoun, dec.   8,442 16
Gross amount of debit items................ $15,640 61
Then follow the credits:

*Sundries* Dr. *to Wm. King, dec'd.*
J. C. Calhoun, to amount bought at administra-
tor's sale................................   $8,442 16
Amount of notes received of D. A. Griffin, ad-
ministrator..............................     2,421 43

                                           $10,853 59
This was received by the orphans' court as a report of in-
solvency.

The record of the administration of Spence, upon J. C.
Calhoun's estate, shows, that on the 4th June, 1842, he re-
ported an inventory of the notes, receipts, &c., handed over
to him by D. A. Griffin, his predecessor, as belonging to the
estate of J. C. Calhoun, amounting to $2,771 68.    On the
18th July, 1842, he obtained an order for the sale of some
corn and cotton of his intestate, which he returned afterwards

as having sold for $45 82. On the same day that this order was made, the following entry appears: "This day came Solomon Spence, as sheriff, and administrator of the estate of John C. Calhoun, deceased, and exhibited a statement of the indebtedness of said decedent to the estate of Wm. King, and other creditors, together with the amount probable, and certain, of the assets in his said administrator's hands of said Calhoun's estate, and the debts of the deceased, exceeding the assets. It is ordered by the court, that the report of insolvency made by the said Spence of his intestate's estate be received, and that the estate of the said John C. Calhoun is hereby declared to be insolvent, and that the same be administered, and finally settled as an insolvent estate." The "statement" here said to be exhibited, is not found in the record.

The defendant also offered in evidence the record of a recovery in chancery, by one David A. Calhoun v. McCartney and others, it being the same recited in the *plea puis darrein continuance*, and which is agreed to be considered as set out in full, to the introduction of which the plaintiff's counsel objected, and excluded the record, to which the plaintiff excepted.

And this being all the proof in the cause, the defendant's counsel asked the court to charge the jury, that if they believed the proof, they should find for the defendant, which charge the court refused to give, and to which the defendant excepted.

The jury found for the plaintiff, and assessed his damages at $2,886 87, for which judgment was rendered.

Errors assigned—

1. In sustaining the demurrer to the plea *puis darrein continuance*.

2. In the matters set forth in the bill of exceptions.

W. P. Chilton and Bowden, for plaintiff in error.

1. The fact that Calhoun sold the slaves (twelve in number) in one lot, when by putting them up in the usual way they would have brought more, coupled with his failure to pay for them, and his entire insolvency, and the further fact that he returned no inventory of his sales, authorized Spence,

who succeeds him, to treat his sale as a nullity and hold the property as King's. [McLane v. Spence, 6 Ala. Rep. 894; Draughan v. French's adm'r, 4 Por. 352.]

2. Spence adopts the sale made of the slaves by the coroner under McCartney's execution, by returning in his report of the insolvency of the estate, the balance of McCartney's debt, credited with the proceeds of said slaves. [See case first above.]

3. In Spence's report of insolvency, he elects to disaffirm Calhoun's purchase, and transfers the notes given for the hire of the slaves to King's estate, and squares the account with Calhoun's estate by charging him with the amount of sales to himself, but crediting him with the same amount.

4. It is the duty of Spence so to manage the estate as to incur the least expense. Justice to the creditors of an insolvent estate forbids that he should charge double commissions, &c. by administering on the property as Calhoun's and then transferring the proceeds, minus the fees, commissions, &c. to King's estate, he thus obtains double commissions. He elected not to proceed thus, and every consideration of public policy sustains his election.

5. The plea *puis darrein continuance* should have been held good. As by the record exhibited by the plea, in a controversy to which the plaintiff and defendant in this suit were parties, a court of competent jurisdiction determines the right of property to be in a third person. [2 Phil. Ev. C. & H. Notes, 822.]

6. But it should have been left to the jury to decide whether the slaves were worth more than the amount decreed to be a charge upon them in chancery. This averment we are to presume the plea contained, and it is warranted by the decree.

7. But the record in the cause of Daniel A. Calhoun v. Spence, McLane, McCartney, et al. was competent proof to be submitted to the jury, because—1. In a judicial proceeding which estops the parties to this suit, the chancellor decides the property is of the estate of David Calhoun, late of Georgia. 2. The sale by the coroner, McLane, is confirmed, and while McCartney, the purchaser, keeps the slaves, he is

charged with the share decreed the complainant. 3. It shows at least a decree for one-third of the property to David Calhoun; which one-third, Spence as administrator of John C. Calhoun, had no right to recover; and to this extent at least, the evidence is good in mitigation of damages. [See cases below.] 4. The record showed in the answer of Spence (his sworn admission) that he was endeavoring to make King's property pay his debts, and that while sheriff, he had levied upon Isaac and Greene, two of the slaves bought in by Calhoun, to satisfy a *fi. fa.* of Baker, Sprouls & Co. v. King's estate, as he well might do. [Bull. N. P. 46; Watts v. Philips, Ib. 49; Muntford v. Gibson, 4 East, 441; Fisher v. Prince, 3 Burr. 1363; Earl v. Holderness, 4 Bing. 462.]

8. In trover, damages are not given for the taking—the *tort* is waived, but the act of converting property to which the plaintiff has the right is the *maleficium*, which entitles the party to damages. [Cooper, et al. v. Chitty, et al. 1 Bur. 31.] Satisfaction for the conversion to the rightful owner, is a satisfaction to one who claims a mere special property.

The measure of damages is the value of the property converted, and interest. [Wilson v. Conine, 2 John. R 280; 2 Cain's Ca. in Er. 200.] But clearly, if the plaintiff only owned two-thirds of the interest in the property, he could (if he can recover at all) only recover to the extent of his interest.

He must have the right to the chattel. [Debow v. Titus, 5 Halst. 128.]

And as one-third, at least, had been decreed to David Calhoun as his distributive share of his father's estate, Spence should not recover for this, and thus McCartney be compelled to make double satisfaction.

But as the case now stands, it is hard to estimate his loss. 1. He is to pay Calhoun the decree, amounting, as we may reasonably suppose, to more than the value of the property. 2. He loses his debt against King's estate, which Spence has credited with the sale of the slaves; and then—3. He is to refund to Spence the value and interest, having indemnified

S. F. RICE, contra.

McLane v. Spence, Adm'r.

ORMOND, J.—The slaves in controversy, were sold by the plaintiff in error as coroner, by virtue of an execution against the representatives of the estate of William King, and the question is, whether they belonged to that estate, or to the estate of J. C. Calhoun, as the property of which they are now claimed.

Previous to Spence, the defendant in error, becoming the administrator of King, Calhoun, as King's executor, and by virtue of power derived from the will, had exposed the slaves in controversy with others for sale, and had purchased them himself; but under such circumstances as would have enabled the legatees or creditors of King to set aside the sale on application to a court of chancery. Subsequently Calhoun died, and Spence, in virtue of his office as sheriff, succeeded his predecessor, Griffin, in the administration both of the estates of King and Calhoun.

When this case, or one involving the same points, and between the same parties, was here at a previous term, (McLane v. Spence, 6 Ala. 898) we held, that as the purchase by Calhoun was voidable at the election of those interested in King's estate, Spence, as the administrator of both estates, might elect to consider the purchase by Calhoun as set aside, as he could not sue himself, and might do that voluntarily which a court of equity would have compelled him to do; but until the sale was set aside by a competent court, or by the election of the administrator of both estates, the title passed to Calhoun by his purchase. The sale has never been set aside by a court of chancery, and the motion for instructions upon the whole evidence, presents the question, whether Spence has himself elected to consider the slaves as the property of King's estate.

The remarks made in McLane v. Spence, *supra*, were predicated upon the facts as they were set out in the bill of exceptions. We have now before us the record of the entire proceedings of the orphans' court upon both the estates of King and Calhoun, and in our opinion it does not justify the inference, that Spence elected to consider the slaves the property of King's estate. The facts relied upon are, that Spence, in rendering an inventory of the estate of Calhoun, did not return these slaves as belonging to that estate. This

fact is of a negative character, and would not be of much avail, unless he had reported them as belonging to the estate of King, in his inventory of that estate, which he did not do. The omission may be accounted for by the fact, that he never had actual possession of the slaves, they having been hired out by his predecessor before his appointment, and sold by the plaintiff in error before the expiration of the term of hiring. We think, therefore, the mere fact, that he did not return them in his inventory as the property of Calhoun's estate, does not establish the fact contended for. Nor is it of any weight, that the notes taken for the hire of these slaves, during the year they were hired out as above stated, were made payable to the administrator of King. The hiring took place under the administration of Griffin, the predecessor of Spence, by virtue of an order of the court directing him to hire them out, as the property of Calhoun, and it is shown that the notes were made payable to the administrator of King by the mistake of Griffin's agent, he being unable to attend the sale. But independent of this, no conclusion could be drawn against Spence from this act, as he was neither a party, or privy to it.

The fact principally relied on is, that in making an estimate of the assets of King's estate, preparatory to an order declaring the estate insolvent, he puts down among the debts due by the estate, $229 31, the balance due on McCartney's judgment. This sum is the balance due upon that judgment, after crediting it by the amount of the sale of the slaves now in controversy, made by the plaintiff in error. The argument, and indeed it may be said the said the just inference from this fact unexplained, would seem to be, that it was an admission that the slaves were rightfully sold as the property of King; but this inference is shown to be unjust, when the accompanying facts are considered.

The report for the insolvency of King's estate was made on the 8th November, 1842, after the execution of McCartney v. King's administrator had been returned satisfied, except for the sum of $229 31, and we cannot think it was the duty of the administrator of King, to assert that a larger sum was due than the plaintiff himself claimed. It is true, the money was made by a sale of these slaves as the property of King's es-

tate, but the sale was forbidden by Spence, and the slaves clamed by him as the property of Calhonu's estate, and eight days before this report of the insolvency of King's estate, this suit was brought to recover the value of the slaves as the property of the estate of Calhoun. These facts, in our opinion, explain the character of the item relied on as an admission. It is evidently nothing more than a statement of what McCartney claimed to be due on his judgment. He also in the same report, puts down as an item of debit, $8,442 16, the amount of the purchases of Calhoun of the estate of King. This is clearly a mistake, as it should have been put down among the assets, and is accordingly so put down; but the consequence of thus neutralizing the two items is, that the estate, which from the showing made, appears to have an excess of assets of $3,665 14 beyond the claims against it, is declared insolvent. There may have been other matters brought to the notice of the orphans' court, and which influenced its judgment in declaring the estate insolvent, but the report of the administrator is so loose, incoherent and unsatisfactory, that no inference of any kind can be deduced from it, without great danger of mistake. Certainly, when considered in connection with the other facts which have been stated, it is entitled to no weight whatever, as an admission of the fact attempted to be deduced from it.

Some reliance is also placed upon an admission in the answer of Spence, to a bill in chancery filed by David A. Calhoun against Spence and others, claiming these and other slaves, as his property, as the heir of his father, of whom King was the administrator. The record of the chancery cause was rejected by the court below, but if we could look to it for this purpose, it would not avail the defendant in error. The admission made by Spence, is of two slaves, not involved in this suit; which he had levied on and sold as sheriff, before he was administrator either of King or Calhoun. But in addition to this, the entire record, and decree were offered in evidence, and from other answers of Spence, made after he was appointed administrator of these estates, he claims these slaves as belonging to the estate of Calhoun. This motion for a charge upon the entire testimony of the cause, is in the nature of a demurrer to the evidence, and in

our opinion it establishes, that Spence, since he has been the administrator of these estates, has always claimed to hold these slaves as the property of the estate of Calhoun.

The plaintiff, at the trial of the cause, pleaded *puis darrein continuance*, the record of a suit in chancery instituted by one David A. Calhoun, against Spence, the present defendant, McCartney and others, the purpose of which was to subject the slaves in controversy, and others, to the payment of his distributive share of his father's estate, in the hands of King, its administrator, and claiming those slaves as the property of his father's estate.   See this case reported *supra*.

The chancellor decreed that these slaves were a fund, out of which the complainant was to be paid his distributive share, and that they were liable in the hands of McCartney, and others as purchasers with notice of his equity.   He further made a reference to the master to ascertain what was due to the complainant as distributee, crediting King's estate with the proper compensation for the board, education and clothing of the complainant.   He also directed an account to be taken of the value of the slaves held by the different defendants, with the value of the hire, and when the sum due the complainant was ascertained, he further directed the master to apportion it among the different defendants, according to the value of the slaves held by them, purchased as aforesaid, and if they did not pay the sum so ascertained to be due within thirty days after notice, an execution was to issue against them, and each of them, for the amount so withheld, &c.   To this plea the court sustained a demurrer.

Waiving all other objections to this plea, it is sufficient to say, that it presented no fact, by which the jury could ascertain, either the right of the defendant to a verdict, or the damages, if any, to which the plaintiff was entitled.   Conceding that the defendant could in this action avail himself of any defence which the purchasers at the execution sale could make, and supposing further, that a liability to pay, was equivalent to a payment in fact, yet the decree does not ascertain what sum, if any, the purchasers of the slaves are liable to pay.   The only fact definitely ascertained by the decree, is, that the complainant has a *lien* upon these slaves in the hands of the purchasers, for an aliquot portion of the

sum which, upon taking the account, may be found to be due from King, the administrator, to the complainant. What that sum is, or what the share or proportion of each will be, or whether any thing is due, is wholly uncertain. Indeed the decree, though in form final, is in its nature essentially interlocutory merely, and the demurrer to the plea was properly sustained. See the case of McCartney, et al. v. Calhoun, *supra*.

These remarks apply fully to the motion made to offer the decree in evidence, in mitigation of damages.

Judgment affirmed.